H. F. BASHFORD V. L. D. WELLS.

No. 15,576.   (96 Pac. 663.)

SYLLABUS BY THE COURT.

1. ADULTERY—*Evidence.* The sexual intercourse of a married man with a woman other than his wife, whether married or single, is adultery upon his part within the meaning of the statute making adultery a misdemeanor.

2. SLANDER—*Evidence—Pleading.* Where a petition in an action for slander alleges that the defendant said of the plaintiff, a married man, intending thereby to charge him with the offense of adultery: "B. was undoubtedly down the railroad track with some woman; I believe it; he is guilty, I know he is," it is error to sustain an objection to the introduction of any evidence upon the ground that the words complained of are not susceptible of the meaning attributed to them or that sufficient facts are not pleaded to show that they were used in that sense.

Error from Norton district court; WILLIAM H. PRATT, judge. Opinion filed June 6, 1908. Reversed.

*Gregg & Gregg,* and *L. H. Wilder,* for plaintiff in error.

*L. H. Blackledge,* for defendant in error.

The opinion of the court was delivered by

MASON, J.: This is an action for slander. The petition alleged the utterance of words which the plaintiff claims imputed to him the crime of adultery. The trial court sustained an objection to the introduction of any evidence for the reason that the petition failed to state facts sufficient to constitute a cause of action. In justification of this ruling two contentions are made: (1) That the language pleaded as defamatory did not charge an act of sexual intercourse; and (2) that, even if so, it did not charge adultery or any other public offense, because it failed to allege that the woman in the case was married. The petition contained several

counts, only one of which—that designated as the third
—need be considered. Its substantial allegations, so
far as here important, were as follow:

"That all of the times hereinafter mentioned the
plaintiff was, and now is, a married man . . . that
on or about June 24, 1905, . . . such defendant
. . . did, falsely, wantonly, and maliciously, speak
and publish of and concerning the plaintiff, as fol-
lows: 'Bashford,' meaning the plaintiff, 'was undoubt-
edly down the railroad track with some woman.' 'I,'
meaning the defendant, 'believe it,' meaning that he,
defendant, believed that the plaintiff was down the
railroad track with some woman. 'He,' meaning the
plaintiff, 'is guilty,' and 'I,' meaning the defendant,
'know he,' meaning the plaintiff, 'is,' meaning that the
plaintiff, on a certain night theretofore, had been down
the railroad track of the Missouri Pacific Railway Com-
pany engaged in an act of adultery."

It is argued that the words of the defendant are not
capable of the meaning attributed to them; that in
themselves and according to their ordinary significance
they imputed to the plaintiff no conduct that was not
perfectly proper and innocent; and that no facts are
set out in issuable form giving them any other color.
To this it may be answered that, while the words
"Bashford was undoubtedly down the railroad track
with some woman" are susceptible of an innocent con-
struction, they might under some circumstances carry
the suggestion of an illicit relation. And the expres-
sion "he is guilty" is entirely inconsistent with the
idea that the speaker had in mind a harmless act. Of
this expression the defendant says in his brief: "How
does it imply adultery? He may have been guilty of
fornication; simple assault; robbery; insult or indis-
cretion." There is no difficulty in saying that the
words complained of, taken together, might well imply
a charge of unchastity. As they were capable of that
meaning it was the proper office of the innuendo to

present the issue whether they were in fact so used. (*Henicke v. Griffith*, 29 Kan. 516.)

"It is not necessary in order to constitute actionable slander that the words should amount to a directly affirmative charge of fornication, adultery, or unchastity; it is sufficient if the words were calculated to induce the hearers to suppose and understand that the person against whom they were uttered was guilty of unchastity, charges of unchastity against men being within the application of the rule as well as imputations upon women." (25 Cyc. 319.)

It is hardly necessary to cite further authorities on this question, but the following examples of words that have been held actionable as charging illicit sexual relations seem sufficiently like those under consideration to be pertinent:

"What a pity we have got such a man for a director. His moral character is not good. You must have heard about his being caught with the house-girl. I have got proof enough. I have been looking around and I know it's so. He is vile." (*Lovejoy v. Whitcomb*, 174 Mass. 586, 587, 55 N. E. 322.)

"Baden saw or told him that . . . he either scared or drove Jane Owens and a man supposed to be Jo. Dearmond up from behind a log; . . . that they broke and run, and that he (Baden) got her parasol and handkerchief, and if anybody did not believe him he could come and see them." (*Proctor v. Owens*, 18 Ind. 21, 81 Am. Dec. 341.)

"She is a dangerous woman, and inclined for men." (*Ronnie v. Ryder*, 8 N. Y. Supp. 5, 6.)

"I knew her grandfather Link. He was a woman's man, and Rose is just like him. Her mother, Henrietta Parkhurst, is like her father, and Rose is no better." (*Derham v. Derham*, 123 Mich. 451, 452, 82 N. W. 218.)

"Paget left his wife at my father's, and then went down to George's with his horse and sleigh, and wanted George to take care of his horse, and while he was gone, Paget and his wife went into the bedroom together, and when George came back from the barn,

he found them both there." (*Sturtevant v. Root*, 27 N. H. 69, syllabus.)

"She [a prostitute] is, I understand, under the patronage or protection of a Mr. More." (*More v. Bennett*, 48 N. Y. 472, 475.)

"Augustus . . . caught them . . . [a man and a woman] together in the packing-room, and went home and told his mother." (*Catharine Evans v. Tibbins et uxor.*, 2 Grant's Cases [Pa.] 451.)

"Complaints from outside parties were sent to the department, one asking for his dismissal on account of intimacy with a well-known young local elocutionist." (*Collins, Appellant, v. Dispatch Pub. Co.*, 152 Pa. St. 187, syllabus, 25 Atl. 546, 34 Am. St. Rep. 636.)

"I do not visit Mrs. Henicke . . . would be ashamed to be associated with her. . . . Mrs. Henicke keeps that grocer man, Broadwell—he calls two or three times a day; she . . . thinks more of Broadwell than she does of her husband; Henicke . . . is a mere ornament which she keeps there for certain purposes; Broadwell remains in the house for hours when Henicke . . . is away, alone with Mrs. Henicke." (*Henicke v. Griffith*, 29 Kan. 516, 517.)

That no injustice is done the defendant by the interpretation suggested is shown by his answer, which, after a general denial, proceeded as follows:

"For a further defense in said cause defendant alleges the fact to be that on the 13th day of June, 1905, on the night of said date, between the hours of eight o'clock P. M. and half past ten o'clock P. M. of said night, in the county of Norton, state of Kansas, and near the town and village of Edmond, in said county, on or near the track of the railroad known as the Missouri Pacific railroad, a short distance east of said Edmond, to wit, a little more than one-half mile, the plaintiff was then and there in company with a woman whose name is to the defendant unknown, and then and there committed an act of sexual intercourse with such woman."

No special damages having been alleged, doubtless the defamatory words were not actionable unless they

Bashford v. Wells.

did charge adultery.  It is therefore necessary to decide whether illicit sexual intercourse with a single woman can constitute that offense, for if not the petition was probably defective in omitting to state that the woman referred to in the utterance complained of was married.  (25 Cyc. 443.)  There is a conflict of authority upon this question, the origin of which is thus explained in volume 1 of the American and English Encyclopædia of Law, at pages 747, 748:

"Adultery, by the common law, is criminal conversation with a man's wife.  The woman must be married; she must be another man's wife; and whoever, married or single, has illicit intercourse with her, becomes guilty of adultery.

"The common law concerned itself with the act of adultery only as it tended to expose an innocent husband to maintain another man's children, and having them succeed to his inheritance.  Hence adultery was limited to criminal conversation with a married woman; the connection of a married man with a single woman does not, by the common law, make him guilty of the offense. . . .  By the canon or ecclesiastical law adultery was sexual connection between a man and a woman, of whom one at least was lawfully married to a third person.  The ecclesiastical law regarded adultery as a sin arising out of the marriage relation.  And, as a violation of the marriage vow, it was equally great whether the offender was male or female.  Hence the offense was broader than at common law, and was committed by a married man having connection with a single woman. . . .  In defining the crime of adultery under statutes of this kind the courts of some of the states have, it seems, adopted the definition of the common law.  Thus it is held that the sexual intercourse of a single man with a married woman is adultery in the man.  But it is considered that adultery can be committed only with a married woman, so that a man, though married, does not commit the crime by having intercourse with a single woman.

"Other authorities are more in accordance with the ecclesiastical law.  They sustain the general proposition that an illicit sexual connection between two per-

sons, either of whom is married, is adultery in the married person. Consequently a married man commits the crime by having intercourse with a single woman."

In volume 1 of the Cyclopedia of Law and Procedure, at page 953, it is said:

"Since the gist of the crime, independently of statutory enactments, is the danger of introducing spurious heirs into a family, whereby a man may be charged with the maintenance of children not his own, it would seem to be the better doctrine that a man can not be guilty of adultery by sexual intercourse with an unmarried woman; and where he is criminally liable for the offense, the fact arises from some feature of the statute which brings the act within the definition given of the crime."

On the other hand, Mr. Bishop, in his work on Statutory Crimes, says (3d ed., §§ 654a, 656, 657):

"Although adultery was not punishable in the English common-law courts, it was in the ecclesiastical; and it was ground also for the divorce from bed and board. The word, therefore, had acquired a precise legal meaning; and, for reasons already explained, the courts, in interpreting the new statute, should give it this established meaning. It is: Adultery is the voluntary sexual intercourse of a married person with one not the husband or wife. . . . In all cases where one of the parties to an act of criminal intercourse is married and the other is not it is adultery in the married party and fornication in the unmarried. Such, by the superior weight of the adjudications, the doctrine is believed to be. . . . However men may differ in their speculations, our *law,* from its earliest periods down to the very time when these adultery statutes were enacted, has placed the incontinence of husband and wife on an exact level; granting the same remedy of divorce from bed and board—or, under statutes, from the bond of matrimony—for either; it has had constantly one definition, and no more, of 'adultery.' We have seen what the definition is. A court sits to administer the *law* which it finds, not the *speculations* of the incumbents of the bench or of anybody else. So that, whatever the private views of a judge may be, he should judicially give to the word

'adultery' in the statutes under contemplation the meaning which the *law* has assigned to it, unless the legislature has indicated otherwise."

The Kansas statute (Gen. Stat. 1901, § 2221) reads: "Every person who shall be guilty of adultery . . . shall on conviction be adjudged guilty of a misdemeanor." The law in this form was enacted in 1869, amending a section adopted from Missouri, which read: "Every person who shall live in a state of open and notorious adultery." (Rev. Stat. Mo. 1845, ch. 47, art. 8, § 8.) The Missouri courts seem not to have directly decided the force of the word in the original act. But in *State v. Bess,* 20 Mo. 419, it was said:

"It is not sufficient to charge that two persons did live in a state of open and notorious adultery; it must be shown that one or both are married; adultery is a violation of the marriage bed." (Page 420.)

This seems to imply that adultery is possible where either one of the parties is married. A similar expression occurs in *Dameron v. The State,* 8 Mo. 494; and in *State v. Bonine,* 85 Mo. App. 462, this language was used in interpreting a statute making it a misdemeanor falsely to accuse a female of adultery:

"Adultery is defined as criminal intercourse between a married person and one of the opposite sex, whether married or single—sexual connection between a married woman and an unmarried man or a married man other than her husband." (Page 467.)

Whatever the word may have meant in the original enactment we think it was employed in the amendment in its usual and ordinary significance, which we conceive to be an act of illicit sexual intercourse committed by a married person—its essential criminality consisting of the violation of the marriage vow. In the edition of Webster's dictionary published in 1854 this definition was given:

"Violation of the marriage bed; a crime, or a civil

injury, which introduces or may introduce, into a family, a spurious offspring.

"In *common usage,* adultery means the unfaithfulness of any married person to the marriage bed."

While this recognizes the etymological meaning, it points to the other as that more generally accepted. Worcester's dictionary, in the edition of 1859, adopted Burrill's definition, in these words:

"Criminal intercourse between a married person and one of the opposite sex, whether married or single; violation of the marriage bed."

The following definitions are from the current editions of the works cited:

"The unfaithfulness of a married person to the marriage bed; sexual intercourse by a married man with another than his wife, or voluntary sexual intercourse by a married woman with another than her husband." (Web. Inter. Dict.)

"Violation of the marriage bed; carnal connection of a married person with any other than the lawful spouse; in a more restricted sense, the wrong by a wife which introduces or may introduce a spurious offspring into a family." (Cent. Dict.)

"The sexual intercourse of two persons, either of whom is married to a third person." (Stand. Dict.)

"The voluntary sexual intercourse of a married person with a person other than the offender's husband or wife." (Bouv. Law Dict.)

"In criminal law. Criminal conversation between a married person and one of the opposite sex, whether married or single, being in the former case sometimes called *double,* and in the latter *single,* adultery. In England it was anciently punished as a crime, but is now left to the coercion of the spiritual courts, the temporal courts taking no cognizance of it, otherwise than as a private injury; for which, in the case of adultery by a wife, the husband may have an action of trespass against the adulterer." (Burrill's Law Dict.)

The statement that at the common law the term "adultery" was confined to illicit sexual intercourse to

which a married woman was a party is at least inaccurate. The word in English law has always been applicable to such an act where either participant is married. In Blount's Law Dictionary (1717) it is said:

"Adultery is properly spoken of married persons; but if only one of the two, by whom this sin is committed, be married, it makes adultery; which was severely punished by the ancient laws of this land."

This is repeated in substance in the law dictionaries of Crowell (1723) and Cunningham (1783). But as adultery was not a crime cognizable by the temporal courts the common law had to do with it only as affording a right of private action to the injured husband. The common-law courts gave no remedy of any character for the incontinence of a husband where his paramour was unmarried, not because his act was not adultery, but because it was not the kind of adultery of which they had jurisdiction; they afforded no punishment for unfaithfulness to the marriage bed by either spouse, not because it was not in each case adultery, but because adultery was not a crime.

The matter is very fully treated in volume 2 of the tenth edition of Wharton's Criminal Law, where it is said (§§ 1717-1719, 1721):

"Adultery is not cognizable penally by the English common law, its punishment being reserved in England to the ecclesiastical courts. As, however, in those portions of the United States which accept the English common law the ecclesiastical law is considered, so far as concerns the definition of the offense, to be in force, we must begin by inquiring what the ecclesiastical law in this respect prescribes.

"Adultery, by the Roman law, was confined to illicit sexual intercourse with a married woman, the woman and her paramour being principals in the offense. A married man who had illicit intercourse with an unmarried woman was not guilty of this specific crime. . . . But Christianity, speaking through the canon law, materially modified this feature of Roman juris-

prudence. . . . Hence the offense was committed by a sexual violation of the marriage vow, be the offender male or female. The married man having sexual intercourse with a woman other than his wife was as guilty of adultery as a married woman having sexual intercourse with another than her husband. . . . Adultery, according to the definition thus established, is sexual connection between a man and a woman, one of whom is lawfully married to a third person; and the offense is the same whether the married person in the adulterous connection is a man or a woman. The Roman law being in this respect superseded, this definition was accepted by every Christian state at the time of the colonization of America, and is no doubt part of the common law brought with them by the colonists of all Christian nationalities. That it corresponds with a sound judicial philosophy is illustrated by the fact that it is incorporated in the codes of the principal continental European states. . . . Where there is a positive local statute defining adultery, of course such statutory definition must be accepted. But when 'adultery' simply is made indictable, then it must be remembered that, as just stated, the term is to be taken in the sense accepted at the time of the settlement of America, and for many centuries internationally received, namely: sexual connection by a man and a woman, one of whom is lawfully married to a third person. And this definition alone meets the full evil, which is the contempt cast on the marriage state, and the misery and demoralization produced in families by marital disloyalty of either father or mother."

The judgment is reversed and the cause remanded for further proceedings.